UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KALZIP, INC.,
a Delaware corporation,

       Plaintiff/Counter-Defendant,

vs.                                             Case No. 8:11-cv-01842-T-27TBM

TL HILL CONSTRUCTION, LLC,
a Florida limited liability company,

       Defendant/Counter-Plaintiff.
_____/

**ORDER**

      **BEFORE THE COURT** are Plaintiff/Counter-Defendant's Motion for Summary Judgment
and to Strike Jury Demand (Dkt. 82), TL Hill Construction's Opposition to Kalzip's Motion for
Summary Judgment and to Strike Jury Demand (Dkt. 87), and Plaintiff/Counter-Defendant's Reply
in Support of its Motion for Summary Judgment and to Strike Jury Demand (Dkt. 93).  Because the
undisputed facts demonstrate that the parties entered into an enforceable contract containing terms
and conditions supplied by Kalzip, Inc. ("**Kalzip**") and agreed to by TL Hill Construction, LLC
("**TL Hill**"), and that TL Hill has proffered no competent evidence supporting its claim that Kalzip
breached the contract resulting in damages to TL Hill, Kalzip is entitled to summary judgment in its
favor on its breach of contract claim and on the counterclaims asserted by TL Hill.[1]

---

[1] While a counterclaim for breach of contract (and a related affirmative defense) based on the delivery of
nonconforming goods ***could*** create a disputed issue of material fact precluding summary judgment in favor of Kalzip,
the failure of TL Hill to proffer evidence that any purported breach of contract by Kalzip **caused** TL Hill to incur
damages renders immaterial the fact that Kalzip may have breached the parties' contract. *See, e.g.*, *Henderson–Smith
& Associates, Inc. v. Nahamani Family Service Center, Inc.*,752 N.E.2d 33, 43 (Ill. App. Ct. 2001) ("The elements of
a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3)
breach of contract by the defendant; and (4) ***resultant injury to the plaintiff***.") (emphasis added).

## Introduction

Kalzip filed this action against TL Hill seeking to recover approximately $223,000 it contends remains due and owing for materials supplied to TL Hill in connection with a construction project in Virginia.  TL Hill contends that it is not liable to Kalzip because Kalzip breached the parties' contract (or more specifically failed to satisfy the conditions precedent to such contract) by supplying nonconforming and/or defective materials.  TL Hill has filed counterclaims against Kalzip seeking damages it allegedly incurred as a result of Kalzip's delivery of nonconforming and/or defective materials, including (i) repair costs of approximately $900,000 that TL Hill allegedly incurred in connection with the project, and (ii) lost profits of over $7 million that TL Hill allegedly suffered by being precluded from working on other construction projects.

## Factual Background

Kalzip was engaged in the business of sourcing, manufacturing, and supplying commercial grade aluminum roof panels and related products for use in the construction of buildings.[2]  TL Hill was engaged in the business of installing exterior building siding and roofing. On or about February 8, 2010, TL Hill entered into a subcontract with a general contractor, The Haskell Company ("**Haskell**"), to install metal siding and roofing and sunshades in connection with the construction of a Rolls-Royce manufacturing facility in Prince George, Virginia (the "**Project**").[3]

_____

[2] Kalzip was formerly known as Corus Building Systems, Inc.

[3] The facts in this case are consistent with the customary construction project where a general contractor (or in this case a subcontractor) solicits bids from subcontractors (or sub-subcontractors or suppliers) before submitting its bid to the owner or general contractor.

> An owner puts a particular project up for bid. Before interested general contractors submit bids, they solicit bids from subcontractors and suppliers. There may be and frequently are a large number of such subcontractors and suppliers. Based upon the totals of low subcontractors and supplier bids and upon other considerations, general contractors then submit bids to the owner. Following a determination of the low bid, the successful general contractor then sends subcontracts to each of the low-bidding subcontractors based upon their initial estimates.

*S.M. Wilson & Co. v. Prepakt Concrete Co.*, 318 N.E.2d 722, 724 (Ill. App. Ct. 1974).

In anticipation of the subcontract between TL Hill and Haskell, TL Hill and Kalzip entered into a contract for the sale of aluminum roofing and related materials to be incorporated into the Project (the "**Contract**").  While both parties acknowledge that they entered into an enforceable Contract, the parties dispute the terms of the Contract and whether Kalzip complied with the conditions precedent, if any, to the Contract.

On or about February 4, 2010, Kalzip sent TL Hill via email: (1) a detailed Quote/Material Purchase Order Form, (2) Kalzip's Credit Account Application Form, and (3) Kalzip's General Terms and Conditions of Sale (the "**Kalzip Terms**").  The cover letter accompanying the email states:  "All orders are accepted and all goods and services are supplied subject to the [Kalzip Terms], which are available on request."  The Kalzip Terms contained the following relevant provisions:

14.    LIMITATIONS OF BUYER'S REMEDIES

*****

In keeping with the course of performance and dealing, usage of trade, and accepted practice of Seller, Seller's liability to Buyer or to any party claiming through or on behalf of Buyer, with respect to any claim or loss arising out of this transaction or alleged to have resulted from an act or omission of Seller's negligence or otherwise, including failure to deliver, delay in delivery, or breach of warranty, shall be limited to an amount equal to the purchase price of the goods paid by the Buyer to the Seller less the fair market value of the goods in Buyer's possession with respect to which such liability is claimed or, when appropriate and at the option of Seller, replacement of the goods or replacement and pick up of the goods.  IN NO EVENT SHALL SELLER BE LIABLE FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, LOSSES, OR EXPENSES ARISING OUT OF THIS TRANSACTION.

*****

3

21.     CHOICE OF LAW

This contract shall be governed by and interpreted in accordance with the laws of the State of Illinois which are in force on the date of this Agreement.   Whenever a term is defined by the Uniform [C]ommercial [C]ode as adopted in the State of Illinois is used in this contract, the definition in said Uniform Commercial Code shall control.[4]

*****

22.     JURY WAIVER

IN ANY CONTROVERSY OR CLAIMS ARISING OUT OF OR RELATING TO THE CONTRACT OR THEE TERMS AND CONDITIONS, BOTH THE SELLER AND THE BUYER WAIVE THEIR RIGHT TO TRIAL BY JURY.

Vinet Decl. (Dkt. 82-1), ¶ 9.

On or about February 5, 2010, TL Hill executed and returned Kalzip's Credit Account Application Form along with a copy of the Kalzip Terms.  On the Credit Account Application Form Nicole L. Hill, acting as a registered director of TL Hill, acknowledged:

> *I, being a Director of this Company, have read the Conditions of Sale of Kalzip Inc. and accept these as the basis of trading between our Companies*.  In particular, I undertake to ensure that payment of all accounts will be received by you (our supplier) in accordance with your Conditions of Sale.  I appreciate that the adherence to this obligation is the basis of the contract between us.

Vinet Decl. (Dkt. 82-1), ¶ 8 (emphasis added).  Also on or about February 5, 2010, TL Hill provided Kalzip with a letter indicating its intention to use Kalzip as its vendor for the "Metal Roof and Skylights scopes of work on the [Project]," authorizing Kalzip "to proceed with shop drawing preparations along with any other submittals required for this job," and referencing P.O. No. 010510-02 in the amount of $420,049.80.  *See* Vinet Decl. (Dkt. 82-1), ¶ 11.

---

[4] For purposes of Kalzip's motion for summary judgment, Illinois and Florida law are virtually identical.  In any event, TL Hill appears to concede that Illinois law governs the parties' dispute given its reliance on Illinois law in its opposition memorandum.

On February 7, 2010, TL Hill issued a Purchase Order approving and accepting the Kalzip proposal.[5]  TL Hill also ordered and accepted additional aluminum roofing and related materials pursuant to the Contract, raising the total contract price to $626,198.33.  *See* Vinet Decl. (Dkt. 82-1), ¶ 12.  Neither the Purchase Order nor any other communications by TL Hill purported to object to, or modify, the Kalzip Terms.

TL Hill contends that the February 5, 2010 letter of intent/authorization included a condition precedent requiring Kalzip to prepare shop drawings and other submittals required for the Project.[6] TL Hill argues that Kalzip failed to satisfy this condition precedent because Kalzip failed to provide TL Hill with the correct bearing plates and clips specified in the plans it prepared and submitted to Haskell for approval.

Between June 25, 2010, and January 14, 2011, Kalzip sent TL Hill invoices for the materials provided.  Each invoice stated: "All orders are accepted and ... all good and services are supplied subject to [the Kalzip Terms]."  Vinet Decl. (Dkt. 82-1), ¶ 14. TL Hill has paid Kalzip only $402,823.22 of the agreed contract price of $626,198.33.  Despite repeated demands, TL Hill has refused to pay the remaining balance of $223,375.11.  Vinet Decl. (Dkt. 82-1), ¶ 15.

---

[5] While Kalzip appears to dispute the authenticity (and timeliness of TL Hill's production) of the Purchase Order, it is evident from the record that either the February 5, 2010 letter of intent or the February 7, 2010 Purchase Order constituted an acceptance of Kalzip's quote and that neither purports to incorporate any different or additional terms or conditions to those contained in the Kalzip Terms.

[6] The failure of a condition is an affirmative defense to a breach of contract cause of action. *Local 165, Int'l Bhd. of Elec. Workers v. Bradley*, 499 N.E.2d 577, 585–86 (Ill. Ct. App. 1986); *LaGrange Fed. Sav. & Loan Ass'n v. Rock River Corp.*, 423 N.E.2d 496, 499 (Ill. Ct. App. 1981).  Under Rule 9(c), conditions precedent may be alleged generally in a complaint.  If the defendant disagrees with that allegation, "a denial of performance or occurrence shall be made specifically and with particularity."  Fed. R. Civ. P. 9(c); *see, e.g., Jackson v. Seaboard Cost Line R.R.*, 678 F.2d 992, 1010 (11th Cir. 1982).  TL Hill did not raise the failure of a condition precedent as an affirmative defense, let alone deny such failure specifically and with particularity.  Nonetheless, the Eleventh Circuit has held that the "specific denial of performance of conditions precedent may be raised by motion as well as by answer."  *See Assoc. Mech. Contractors, Inc. v. Martin K. Eby Constr. Co.*, 271 F.3d 1309, 1317 (11th Cir. 2001) (defendant "no doubt" articulated plaintiff's failure to satisfy contractual condition precedent in its fourth summary judgment motion and memorandum in support and did not waive its rights under that contractual provision).

TL Hill contends that as a result of Kalzip's breach, it incurred repair costs of approximately $932,116.60 and lost profits in the range of $7 to $10 million because TL Hill was unable to obtain additional work from Haskell and Rolls-Royce.  *See* TL Hill's Initial Disclosures (Dkt. 82-6), § (iii). The Magistrate Judge, however, limited TL Hill's claims for lost profits to those specifically identified by TL Hill in its counterclaim, to wit: the Camp Pendleton and P-625 Quantico Virginia Projects.  *See* Order (Dkt. 81), pp. 5-7.[7]

## Standard on Summary Judgment

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c).  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case."  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  *Id.* at 1260.  All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use

---

[7] In his Affidavit, Travis L. Hill indicates that as a direct result of the Kalzip dispute, Haskell pulled the projects for Camp Pendleton and P-625 Quantico Virginia which had been awarded to TL Hill.  Affidavit of Travis L. Hill (Dkt. 87-1), ¶¶ 44-45.  Hill avers that until the issues relating to the Project are resolved, TL Hill is unable to bid on Haskell projects.  *Id.* at ¶ 46.

of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. The evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable jury could find for the non-moving party. *Id.*

## Discussion

TL Hill does not dispute that the parties entered into a Contract, but rather contends that there is uncertainty as to what documents and terms form the basis for the Contract. Specifically, TL Hill contends that whether the Contract "was/is comprised of the credit application, letter of intent, purchase order, and/or invoice, is something that has yet to be determined." Affidavit of Travis L. Hill (Dkt. 87-1), ¶ 26. The undisputed facts, however, demonstrate that a Contract was formed between the parties and that the Kalzip Terms were incorporated into the Contract. *See Regency Commercial Assoc., LLC v. Lopax, Inc.*, 869 N.E.2d 310, 316 (Ill. App. Ct. 2007) ("construction of a contract is a question of law").

### *The Contract Terms*

Despite TL Hill's repeated contentions that it did not agree to the Kalzip Terms, the undisputed evidence demonstrates that the Kalzip Terms were the only "terms" exchanged by the parties. Moreover, rather than objecting to the Kalzip Terms or proposing different terms, TL Hill signed a credit application acknowledging the applicability of the Kalzip Terms, sent a purchase

7

order purporting to agree to the Kalzip Terms, and accepted deliveries of materials accompanied by invoices expressly referencing the Kalzip Terms.

Under the Uniform Commercial Code ("**UCC**"),[8] a contract for the sale of goods may be made in any manner sufficient to show agreement and an agreement sufficient to constitute a contract for sale may be found even if the moment of its making is undetermined.  UCC § 2-204.  As noted, there is no dispute that a contract existed.  The only question is what terms were included in the contract.

Section 2–207 of the UCC addresses this question.  Section 2–207 concerns transactions between merchants and allows parties to enforce their agreement despite discrepancies between the written offer and the written acceptance.  *See Album Graphics, Inc. v. Beatrice Foods*, 408 N.E.2d 1041, 1047 (Ill. App. Ct. 1980).[9]  Both Kalzip and TL Hill proceeded as if (and have

---

[8] Kalzip assumes, and TL Hill does not dispute, that the UCC applies to the parties' respective claims and contentions.  *See also Bonebrake v. Cox*, 499 F.2d 951, 959-60 (8th Cir. 1974) (contract for the sale and installation of bowling equipment was for "goods" rather than services); *Standard Structural Steel Co. v. Debron Corp.*, 515 F.Supp. 803, 810 (D.C. Conn. 1980) (under Connecticut law, a contract for the fabrication and erection of structural steel for a land level submarine construction facility fell within the purview of the Uniform Commercial Code in light of fact that the parties intended that the transfer of goods feature of contract was predominate aspect of the transaction).  Illinois has adopted the pertinent provisions of the UCC and, therefore, citations herein will be to the UCC rather that the complementary Illinois statutory provision.

[9] Section 2–207 reads:

(1)     A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2)     The additional terms are to be construed as proposals for addition to the contract.  Between merchants such terms become part of the contract unless:

(a)     the offer expressly limits acceptance to the terms of the offer;

(b)     they materially alter it; or

(c)     notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3)     Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

acknowledged that) a contract existed between them for the purchase and sale of the roofing materials.  At a minimum, therefore, a contract existed under UCC § 2–207(3).  *See Leighton Industries, Inc. v. Callier Steel Pipe & Tube, Inc.*, No. 89 C 8235, 1991 WL 18413, at *3 (N.D. Ill. Feb. 6, 1991).  Moreover, under the UCC, a definite and seasonable expression of acceptance or a written confirmation (*i.e.*, the letter of intent or purchase order sent by TL Hill) operates as an acceptance unless that acceptance was expressly made conditional on assent to additional or different terms.  TL Hill *never* proposed alternative or different terms. Accordingly, the Kalzip Terms became the operative terms of the Contract.[10]

The Pricing Quote/Material Purchase Order sent by Kalzip to TL Hill on February 4, 2010, was a legally operative offer which could be accepted by TL Hill in any manner and by any medium reasonable in the circumstances.  *See* UCC § 2-206(1).  The "Letter of Intent" sent by TL Hill on February 5, 2010, and the Purchase Order No. 010510-02, dated February 7, 2010, are both sufficient to demonstrate acceptance of the offer.[11]  Even if the Letter of Intent or Purchase Order was deemed to be the offer, Kalzip accepted the offer by shipping goods and forwarding invoices expressly referencing the Kalzip Terms.  TL Hill agreed to the Kalzip Terms by accepting the goods delivered by Kalzip and not objecting to the language in the invoices that stated: "All orders are accepted and

---

[10] With the exception of price, quantity, and nature of the goods to be supplied by Kalzip, the *only* substantive contract terms and conditions proposed by either party (and included in the record for purposes of summary judgment) were the Kalzip Terms.

[11] Because the offer and acceptance were made prior to TL Hill finalizing its subcontract with Haskell on February 8, 2010, the agreement was implicitly contingent on the award of the subcontract by Haskell.  *See In re Chateauguay Corp.*, 162 B.R. 949, 955 (S.D.N.Y. 1994) (contract resulted between general contractor on bridge construction project and subcontractor from which it ordered certain bridge bearing pads once subcontractor sent its acknowledgment of its receipt of general contractor's purchase order, and once sole contingency to order (that general contractor be awarded contract) took place).

... all good and services are supplied subject to [the Kalzip Terms]." Vinet Decl. (Dkt. 82-1), ¶ 14;

*see Leighton Industries, Inc. v. Callier Steel Pipe & Tube, Inc.*, 89 C 8235, 1991 WL 18413, at *3

(N.D. Ill. Feb. 6, 1991) (finding that a buyer's purchase order was an "offer and seller's invoice was

the "acceptance").[12]

### Condition Precedent vs. Delivery of Purportedly Nonconforming Goods

In an attempt to avoid liability to Kalzip (and to avoid the impact of the Kalzip Terms on its

counterclaims for consequential damages), TL Hill argues that Kalzip failed to fulfill one or more

conditions precedent to the Contract. TL Hill argues that as a result, a contract never came into

existence and therefore it never became bound by the Kalzip Terms. TL Hill points out that Kalzip

was responsible for determining the roofing materials required, preparing the shop drawings, and

---

[12] Substantial case law supports the view that the Kalzip Terms were incorporated into the contract given TL Hill's undisputed knowledge of, and failure to object to, those terms. "A contract is materially altered when the additional terms "result in surprise or hardship if incorporated without express awareness by the other party." *Dixie Aluminum Prods. Co. v. Mitsubishi Int'l Corp.*, 785 F.Supp. 157, 160 (D. Ga. 1992) (discussing the UCC Comment to section 2–207, which explains that a clause "materially alters" the contract if it results in unfair surprise). When a buyer receives multiple invoices incorporating the seller's conditions of sale, the element of "unfair surprise" is defeated and the terms cannot be considered "material alterations" to the contract. *Am. Signal Co. v. All Am. Semiconductor of Atlanta, Inc.*, Civil Action No. 1:05-cv-2200-GET, 2006 U.S. Dist. LEXIS 78571, at *22 (N.D. Ga. Oct. 24, 2006); *see also Dixie Aluminum Prods. Co.*, 785 F.Supp. at 160 ("Where a party has received twenty-four invoices with a certain type of charge expressly listed, he should not be surprised if the twenty-fifth contains the same charge ... . As a matter of law, inclusion of such a clause ... was not 'unfair surprise'... [and] the addition of the ... clause was not a material addition to the contract ...").

Therefore, additional terms become part of an agreement where the buyer repeatedly receives the seller's conditions of sale, and consistently fails to object. *Am. Signal Co.*, 2006 U.S. Dist. LEXIS 78571, at *20-21; *Pycsa Panama, S.A. v. Tensar Earth Technologies, Inc.*, 625 F.Supp.2d 1198, 1236 (S.D. Fla. 2008) (noting additional terms become part of agreement where buyer repeatedly receives seller's conditions of sale, and consistently fails to object). This reasoning is even stronger where, as here, TL Hill actually signed a credit application acknowledging that the business dealings between the parties would be subject to the Kalzip Terms.

determining the method of installation to be used by TL Hill.  Affidavit of Travis L. Hill (Dkt. 87-1), ¶ 17.[13]

When a party seeks to rely on a condition precedent to excuse its own failure to pay, it must clearly establish  that the parties intended to create a condition at the time of contracting.  *See, e.g.*, *F.E. Holmes & Son Constr. Co., Inc. v. Gualdoni Electric Service, Inc.*, 435 N.E.2d 724, 726 (Ill. App. Ct. 1982) (finding that contractual provision in question was ambiguous and affirming the trial court's holding that the parties did not intend the provision to impose a condition precedent); *South Division Credit Union v. Deluxe Motors, Inc.*, 355 N.E.2d 724, 726 (Ill. App. Ct. 1976) (finding language of a check endorsement "wholly inadequate" to have created a condition precedent); *see also Catholic Charities of Archdiocese of Chicago v. Thorpe*, 741 N.E.2d 651, 654 (Ill. App. Ct. 2000) ("All of the Illinois cases which our research has disclosed which found a condition precedent to the formation of a contract contain express language on the face of the contract to support that construction.").[14]  TL Hill has failed to clearly establish that the delivery of conforming goods was intended as a condition precedent to the Contract.

The only written support for TL Hill's contention that furnishing shop drawings, approval of the shop drawings by Haskell, and the furnishing of materials in conformity with the shop

---

[13] TL Hill has submitted the conclusory statement of the owner, operator, and manager of TL Hill to establish that Haskell's approval of the roof design prepared by Kalzip was a precondition to the Contract:

> TL Hill could not proceed to order roof materials for the Rolls Royce Project, [sic] until Kalzip's and Haskell's approval as to the roof design and material were received.  Thus, the shop drawings become a necessary precondition to the sub-subcontract that TL Hill had with Kalzip.

Affidavit of Travis L. Hill (Dkt. 87-1), ¶ 15.  There is no dispute, however, that Haskell approved the shop drawings.

[14] In addition, both parties must agree to a condition precedent before it becomes binding.  *See Wasserman v. Autohaus on Edens, Inc.*, 559 N.E.2d 911, 916 (Ill. App. Ct. 1990).

drawings were conditions precedent to the Contract is a single sentence in the Letter of Intent in which TL Hill accepted Kalzip's offer and stated: "Please consider this as your authorization to proceed with shop drawing preparations along with any other submittals required for this job." TL Hill contends that by authorizing Kalzip to proceed with the required shop drawings, the shop drawings became a part of the overall project and a condition precedent to TL Hill's performance under the Contract.[15]

TL Hill contends that Kalzip violated this condition precedent by providing smaller bearing plates than shown in the shop drawings and the wrong clips. As a result, TL Hill contends it was relieved of its obligation to pay for the goods it accepted and incorporated into the Project. Specifically, TL Hill contends that Kalzip supplied 5" x 4" rather than 6" x 6" bearing plates and L25 Clips as opposed to E Clips.[16]

 TL Hill's argument fails to distinguish between a contractual condition precedent and a contractual performance obligation.  When a supposed condition "goes solely to the obligation of the parties to perform, existence of that condition does not prevent the formation of a valid contract." *McAnnelly v. Graves*, 467 N.E.2d 377, 379 (Ill. App. Ct. 1984). The supply of conforming materials was not a condition precedent to the contract between Kalzip and TL Hill.  Rather, Kalzip's failure to supply conforming materials would give rise to a garden variety breach of contract claim by TL Hill.

---

[15] To the extent TL Hill relies on an implied modification of the Contract, the modification fails as a matter of law because it did not comply with the statute of frauds.  *See* UCC § 2-209 (requiring modifications to comply with the statute of frauds).

[16] The Quote/Material Purchase Order Form, Invoices, and shop drawings all indicated that Kalzip was supplying "L25 Clips."  In contrast, the shop drawings do appear to reference larger bearing plates than those ultimately supplied by Kalzip.  Nevertheless, TL Hill accepted the smaller bearing plates supplied by Kalzip and Kalzip's in-house engineer has opined that the smaller bearing clips were appropriate for the Project.

The record demonstrates that the only conditions precedent to the formation of the Contract were (i) Haskell awarding the subcontract to TL Hill and (ii) approval of the shop drawings by Haskell.  There is no dispute that TL Hill was awarded the subcontract and that Haskell approved Kalzip's shop drawings.  *See* Gulden Aff. (Dkt. 87-3), ¶ 3.  In contrast, the shipment of goods conforming to the shop drawings was ***not*** a condition precedent to the Contract.  *Compare Stark Elec., Inc. v. Huntington Housing Authority,* 375 S.E.2d 772, 773-75 (W. Va. 1988) (condition precedent when award was granted "subject to HUD approval"); *Dick Fischer Dev. No. 2, Inc. v. Department of Admin, State of Alaska*, 778 P.2d 1153, 1155 (Alaska 1989) (condition precedent when acceptance was "final notice of award of contract(s) ... if no appeal of the award(s) ... is received...."). As discussed, the delivery of non-conforming goods (*i.e.*, smaller base plates) related to performance, not formation, of the Contract.[17]

Finally, even if the delivery of conforming goods could be deemed a condition precedent, TL Hill waived compliance with that condition precedent by accepting the goods.[18]  Since TL Hill accepted the goods, it is limited to an action for breach.  *See Midwest Builder Distributing, Inc. v. Lord & Essex, Inc.*, 891 N.E.2d 1, 24 (Ill. App. Ct. 2007) ("[O]nce a buyer accepts goods, it is bound

---

[17] The cases cited by TL Hill provide additional examples of language creating a condition precedent.  *See Gould v. Artisoft, Inc.*, 1 F.3d 544, 459 (7th Cir. 1993) ("[a]s a condition of employment, [Gould] will be required to sign the enclosed nondisclosure and noncompetition agreement"); *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 633 (7th Cir. 1992) ( "Dr. Hardin agreed to have HRB buy medical malpractice insurance from Paradigm for $160,950.00 per year, on the condition that Paradigm first send him a certified financial statement and a copy of the insurance policy for review."); *Grill v. Adams*, 463 N.E.2d 896, 900 (Ill. App. Ct. 1984) (location of suitable exchange property for tax purposes was condition precedent to closing on real estate contract).

[18] Similarly, conditions precedent may be waived when a party to a contract intentionally relinquishes a known right either expressly or by conduct indicating that strict compliance with the conditions is not required.  *MBC, Inc. v. Space Center Minnesota, Inc.*, 532 N.E.2d 255, 259–60 (Ill. App. Ct. 1988); *Geldermann, Inc. v. Fenimore*, 663 F.Supp. 590, 592 (N.D. Ill. 1987).  Such conduct might include continuing to accept the breaching party's performance and the benefits thereof after learning of the breach.  *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 776 F.2d 198, 204 (7th Cir. 1985) (interpreting Illinois law).

to pay the contractually agreed upon price for them.").[19]  A buyer is deemed to have accepted goods when the buyer commits "any act inconsistent with the seller's ownership."   UCC § 2–606(1)(c). This rule holds true even if the buyer verbally purports to reject the goods in question.  *Fred W. Wolf Co. v. Monarch Refrigerating Co.*, 96 N.E. 1063, 1066-67 (Ill. 1911).

It is undisputed that TL Hill accepted the materials by incorporating them into the Project. *See Salt Lake City Corp. v. Kasler Corp.*, 855 F.Supp. 1560, 1566 (D. Utah 1994) (where contractor had reasonable opportunity to inspect materials and failed to make effective rejection and incorporated materials into project, breach of contract claim against supplier barred by acceptance of material).  While TL Hill contends that it repeatedly advised Kalzip of the nonconforming nature of the clips and bearing plates and of its "rejection" of the materials, TL Hill is nonetheless deemed to have accepted the materials under the UCC by incorporating them into the project, an act inconsistent with Kalzip's interest in the materials.  Under the UCC, a buyer is deemed to have accepted goods when the buyer commits any act inconsistent with the seller's ownership, even if the buyer verbally purports to reject the goods in question.  *Midwest Builder Distributing, Inc.*, 891 N.E.2d at 24-25.

---

[19] TL Hill has not offered evidence demonstrating that it timely notified Kalzip of its intention to withhold payment in accordance with UCC § 2-717 which would have allowed TL Hill to deduct all or any part of its damages from the price still due under the Contract.  In any event, because TL Hill cannot prove that Kalzip was responsible for (*i.e.*, caused) the problems with the roof, TL Hill is unable to establish damages as required to invoke its right to withhold payment under the Contract.

### *Breach of Contract Claim*

TL Hill asserts three nearly identical affirmative defenses to Kalzip's breach of contract claim, all predicated on Kalzip's failure to supply satisfactory roofing products.[20]   As the party asserting affirmative defenses, TL Hill has the burden of proof.  *See Kinesoft Dev. Corp v. Softbank Holdings, Inc.*, 139 F.Supp.2d 869, 889 (N.D. Ill. 2001).  To meet its burden, TL Hill must establish that the goods contained a defect and that the defect was the cause of the problems with the roof on the Project.  *See Wisconsin Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280, 1289 (7th Cir. 1986) ("If the damage of which the promisee complains would not have been avoided by the promisor's not breaking his promise, the breach cannot give rise to damages.").

TL Hill offers no expert testimony or other competent evidence demonstrating that Kalzip breached the Contract and that this breach caused the roofing problems alleged by TL Hill. While TL Hill contends that expert testimony is not necessary under the "common knowledge" exception to expert testimony,[21] the nature of the alleged damages in this case is not something within the knowledge of a lay individual.  That is, as discussed below, the reasons for the mechanical failure of the roof are beyond the knowledge of a lay individual.  Thus, the failure of TL Hill to timely disclose one or more expert witnesses is fatal to its counterclaims and defenses.  *See* footnote 1, *supra.*

---

[20] TL Hill asserts as affirmative defenses that Kalzip breached the contract by failing to provide a satisfactory product, TL Hill is entitled to set off the amount it expended to correct Kalzip's breach, and Kalzip cannot recover monies from TL Hill for products that contained a design/engineering defect.

[21] *See Jaeger v. Henningson, Durham & Richardson, Inc.*, 714 F.2d 773, 776 (8th Cir. 1983) ("There exists … a "common knowledge" exception to the requirement of expert testimony.  This exception permits juries to pass on issues of negligence that do not require a knowledge of professional skills.")

While TL Hill purports to rely on deviations from the shop drawings to establish Kalzip's

breach, it does not follow that merely because the materials did not comply with the shop drawings[22]

that the materials caused TL Hill's damages (*e.g.*, the problems with the roof on the Project).[23]  TL

Hill's own speculation as to the cause of the roofing failure is insufficient to establish the necessary

inference of causation to provide a basis for its defenses.  *See Aetna Ins. Co. v. Amelio Bros. Meat

Co.*, 538 N.E.2d 707, 334 (Ill. App. Ct.1989); *Muller v. Synthes Corp.*, No. 99 C 1492, 2002 WL

460827, at *6 (N.D. Ill. Mar. 26, 2002); *see also Bartak v. Bell-Galyardt & Wells, Inc.*, 629 F.2d

523, 530 (8th Cir. 1980) ("there can be no finding of architect's negligence unless there is expert

testimony to support it, because laymen would be unable to understand highly technical architectural

requirements without hearing other architects testify as to those requirements").  Tellingly, TL Hill's

counsel represented to the Magistrate Judge that the issue of whether the size of the bearing plates

---

[22] As a practical matter, it is not clear that Kalzip breached the Contract by delivering nonconforming goods to TL Hill.  For example, the Quote/Material Purchase Order Form and Invoices indicated that Kalzip was supplying "L25 Clips" as opposed to "E Clips."  The "L25 Clips" are also reflected in the shop drawings approved by Haskell.  In contrast, the shop drawings did reflect 6"x 6" bearing plates.  However, Kalzip's in-house engineer confirmed in writing to TL Hill that the shop drawings incorrectly showed a 6"x6" bearing plate and that the smaller (5"x4") plates were sufficient for the Project.  *See* Letter from Dan Vinet, PE (Dkt. 88-8).  As noted, TL Hill has offered no expert testimony challenging the representation of Kalzip's engineer.

[23] TL Hill's opposition to the motion for summary judgment spends over a page explaining why it believes the purported smaller bearing plates caused the roof to fail, including a detailed discussion of mathematical calculations purportedly performed by Kalzip.  The calculations are largely unintelligible from a layman's perspective and fail to create an inference that Kalzip's delivery of non-conforming goods was the reason for the problems with the roof on the Project.  At a minimum, an expert witness is necessary to interpret the calculations relied on by TL Hill to establish that Kalzip breached the Contract (Dkt. 88-13) and that the breach ***caused*** damages to TL Hill.

Moreover, while TL Hill admits that the "clip issue" is "more complex" than the bearing plate issue it contends that it need not offer expert testimony to prove the nonconformity because it can point to aluminum material standards published on Kalzip's website and provided to contractors prior to installation.  This documentation, however, reflects only Kalzip's recommendation and does little to establish the causation required for TL Hill to prevail on its breach of contract claim or defenses.  As TL Hill notes, the issue is whether Kalzip provided the proper materials to withstand the friction and movement of the roof panels during thermal movement (*i.e.,* expansion and contracting of the roof panel during the changes in temperature and weather).  This issue is properly addressed by an engineer or other expert witness.

was a factor in causing damage to the roof was "an expert witness issue ... ."  Transcript of November 13, 2012 Hearing (Dkt. 93-1), pp. 8-9.

Without an expert witnesses, TL Hill cannot meet its burden of proving its affirmative defenses to Kalzip's breach of contract claim.  *See Holden Metal & Aluminum Works, Ltd. v. Wismarq Corp.*, No. 00C0191, 2004 WL 1088356, at *2 (N.D. Ill. May 12, 2004) (requiring expert testimony to prove how paint debonded from metal in breach of warranty claim); *Muller v. Synthes Corp.*, No. 99C1492, 2002 WL 460827, at *6 (N.D. Ill. Mar. 26, 2002) (requiring expert testimony to prove design parameters of medical implant in breach of warranty claim); *see also Zurich American Ins. Co. v. BASF Corp.*, No. 08-08255-CIV, 2012 WL 443229, at *4-5 (S.D. Fla. Feb. 10, 2012) (requiring expert testimony to prove materials were defective and were the cause of a fire); *CC-Aventura, Inc. v. Weitz Co., LLC*, No. 060215980CIV, 2010 WL 1856096, at *3 (S.D. Fla. May 10, 2010) (requiring expert testimony to prove waterproofing product was defective in breach of warranty claim).  Similarly, TL Hill has failed to proffer admissible expert testimony to establish that Kalzip breached the Contract in order to prevail on its counterclaims for repair costs and lost profits.

### Consequential Damages

Even if an expert were not required for TL Hill to prove a breach by Kalzip, TL Hill cannot recover its alleged repair costs and lost profits because those damages are "consequential or incidental" damages, the recovery of which are expressly excluded by Kalzip's Terms in bold print. *See Anna Ready Mix, Inc. v. N.E. Pierson Constr., Inc.*, 747 F.Supp. 1299, 1304 (N.D. Ill. 1990); *Frank's Maint. & Eng'g, Inc. v. C.A. Roberts Co.*, 408 N.E. 2d 403, 409 (Ill. App. Ct. 1980).  The UCC permits parties to limit or exclude consequential damages "unless the exclusion is unconscionable."  TL Hill has made no showing that the limitation of damages provision in the

17

Kalzip terms is procedurally or substantively unconscionable. *See Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 263 (Ill. 2006) (discussing substantive and procedural unconscionability). As such, Kalzip is entitled to summary judgment in its favor on TL Hill's counterclaims for repair costs and lost profits.[24]

### Conclusion

The undisputed facts demonstrate that the parties entered into a Contract whereby Kalzip would supply and TL Hill would pay for the installation of roofing and sunshades in connection with the construction of the Project and that the Contract included the Kalzip Terms. Moreover, because TL Hill has failed to offer competent admissible evidence demonstrating that TL Hill breached the Contract by delivering nonconforming materials which caused the alleged roofing problems on the Project, Kalzip is entitled to summary judgment in its favor on all claims, counterclaims, and defenses. Accordingly, it is

(1)    Plaintiff/Counter-Defendant's Motion for Summary Judgment and to Strike Jury Demand (Dkt. 82) is **GRANTED**. Summary Judgment is entered in favor of Kalzip, Inc. on Count I of its Complaint and against TL Hill Construction, LLC on Counts I and II of its Counterclaim.

(2)    Kalzip, Inc. is entitled to recover $223,375.11, plus interest, costs, and attorney's fees from TL Hill pursuant to the Kalzip Terms. Within **fourteen (14) days** from the date of this Order, Kalzip, Inc. shall file a motion for entry of final judgment incorporating a final calculation of the

---

[24] In addition, correspondence from Haskell to TL Hill reflects that multiple concerns unrelated to Kalzip's performance on the Project (including TL Hill submitting false affidavits indicating that it had paid its vendors) led to Haskell refusing to consider additional subcontracts with TL Hill for other projects. *See, e.g.*, Declaration of Gregory Akers (Dkt. 82-2), Ex. B; *see also* Declaration of Kenneth Duncan (Dkt. 82-4), Ex. A. In fact, Haskell appeared concerned that TL Hill had not paid Kalzip the full amount it was owed on the Project. *See, e.g.*, Declaration of Gregory Akers (Dkt. 82-2), Ex. B (August 29, 2011 Letter from Haskell to TL Hill) ("we reiterate our demand that T.L. Hill pay its vendors as it was required to do so under its Subcontract and as it certified to Haskell under oath in its pay applications as having already been done").

18

damages (inclusive of interest, fees, and costs) it contends it is entitled to recover from TL Hill Construction, LLC.  TL Hill Construction, LLC may file a memorandum in opposition in accordance with the Local Rules.

     (3)     The Clerk is directed to **ADMINISTRATIVELY CLOSE** this case.

**DONE AND ORDERED** this ___8th___ day of May, 2013.

 

                                       **JAMES D. WHITTEMORE**
                                       **United States District Judge**

Copies to:
Counsel of Record